[Civ. No. 14517.   First Dist., Div. One.   Mar. 29, 1951.]

PHILLIP R. JOHN et al., Respondents, v. JOHN A. MARSHALL, Appellant.

Clark & Morton for Appellant.

William H. Gale, Jr., Breed, Robinson & Stewart and Richard K. Dutton for Respondents.

BRAY, J.—Defendant appeals from a judgment granting declaratory relief under a certain agreement and awarding plaintiffs the sum of $2,901.76.

### QUESTIONS PRESENTED

1. Is defendant bound by the agreement (a) in view of the fact that it is not signed by all the parties owning property described in it; (b) as defendant is not a party to the agreement?

2. If the parties are bound by the agreement, was defendant entitled under its terms to turn the water system over to plaintiffs?

3. Is defendant liable for the amount of water charges found by the court?

4. Are indispensable parties absent from the action?

### FACTS

There is practically no dispute as to the facts. June 26, 1925, Markham and Moore conveyed to Castlewood Country Club certain real property in Alameda County, formerly owned by Phoebe A. Hearst, together with the right, title and interest of the grantors in a certain contract dated April 29, 1911, between Spring Valley Water Company and Mrs. Hearst, which provided for the use on the property of water to be furnished by the water company from large cisterns located

thereon. The club thereafter sold off lots for home purposes, and through a water system located upon the club's land, with connecting facilities to the various lots, delivered water to the home owners as well as to itself. On December 11, 1939, as a result of considerable dissatisfaction and disputes concerning the water service, the agreement in question* was entered into. The club, and its successors in interest, continued to supply water to the home owners. The club had financial difficulties and was taken over by a bank. A considerable portion of the property was occupied by the premises used for a country club, including an 18-hole golf course, a swimming pool, riding stables, clubhouse, etc. April 19, 1940, defendant entered into a contract to purchase the property including the club premises, all unsold lots in the subdivided portions, and also the contract between Spring Valley Water Company and Mrs. Hearst. The contract specifically provided that the sale was subject to the agreement. Defendant took immediate possession of the property and water system and continued to supply the home owners with water as his predecessors had done and at the same rates, for a period of approximately eight years. While originally some of the water used came from wells on the property, by 1948 all the water used was supplied by the city of San Francisco as successor to Spring Valley. From 1940 defendant has operated the premises as a dude ranch known as "The Old Hearst Ranch," offering to the public for remuneration the facilities of the golf course, dining room, bar, swimming pool, riding stables, etc. He contends he does not keep up the golf course, except the first hole. However, its use is open to the public for which he charges a "green fee." Defendant finally acquired title to the property and the water system by deed dated October 1, 1946. This deed conveyed the property expressly subject to the agreement. February 6, 1948, defendant sent a letter to the attorney for plaintiffs, stating "that, in accordance with the water agreement of December 11th, 1939, between the Castlewood Country Club and the individual property owners (known as the Castlewood Protective Association), I shall turn over to the property owners the operation and maintenance of the water system on Saturday, February 21st, 1948. . . ." He then ceased to operate the system and the home owners have been operating it ever since, supplying water to the dude ranch as well as to themselves.

---

*Hereafter referred to as "the agreement."

At all times during the operation of the system prior to its being taken over by the home owners, a monthly meter rate of $1.50 for the first 1,000 cubic feet and $.75 per 1,000 cubic feet thereafter of water used was charged the home owners. When they were forced by defendant to take over the system, the home owners continued to charge these same meter rates. However, what charge to make defendant for water supplied the dude ranch raised quite a problem. Defendant took water from the system at 36 connections all without meters. After some study, the home owners decided to charge defendant on the basis of 15 meters at the same meter rate charged themselves monthly. Bills were sent defendant accordingly. Defendant made part payment, leaving a balance of $2,901.76 for water supplied up to April 30, 1949, and for defendant's pro rata share of the repairs to said system. While there was some testimony to the contrary, there was ample evidence showing that at the time defendant turned the system over to the home owners it was in bad condition, order and repair.

### FINDINGS

Among other matters, the court found that plaintiffs are either original parties to the agreement or successors in interest to them; that defendant continuously from the date of his acquisition of the property to February 21, 1948, operated the water system and furnished water to plaintiffs "in recognition of and in accordance with" the agreement; that all of those who signed the agreement were owners of improved property within the land described in the basic deed from Markham and Moore, that subject to seasonal requirements defendant utilized water from the system in an area greatly in excess of twenty acres for a golf course, riding stables, swimming facilities, gardens, restaurant, bar facilities and other similar activities connected with the conducting of a dude ranch and at the time of the turnover of the system to plaintiffs had not ceased to operate the property as a "golf club or other similar enterprise"; that the water system was not then in a "reasonable, efficient condition, order and repair"; that the method used by plaintiffs to determine charges assessed against defendant and plaintiffs for their relative proportion of the operation, maintenance and repair of the water system was fair and reasonable; that there were other owners of parcels of property within the basic lands who did not sign the agreement, who became such either by purchase from the club or by succession to the title of persons who had

so purchased; that such owners are at least 15 in number, including Charles Daniel Haas and wife who purchased three acres directly from the club; that Haas and wife on the date of the agreement were persons who came within the description of "second parties" as used in the agreement; that defendant as successor in interest to the club continuously since acquisition of his interest assumed the obligations of the agreement and has operated and still does operate the property as a golf club within the meaning of the agreement; and that the balance due plaintiffs from defendant for his proportionate share of the expenses of the system to December 31, 1948, and for water furnished him to April 30, 1949, is $2,901.76.

## JUDGMENT

The judgment provides (1) for the payment by defendant to plaintiffs of said last mentioned sum; (2) that the agreement became binding upon all persons signing it from the date of signing; (3) that defendant is bound by its terms and is obligated to maintain, manage and operate the water system and to furnish plaintiffs with water from the system; (4) that defendant, under its terms, was not entitled to transfer the operation of the system to plaintiffs.

## THE AGREEMENT

It states that it is between the club and "all of the parties or their successors in interest who purchased from first party" any part of the land described in the deed from Markham and Moore to the club "together with such parties who may not have purchased any part or parcel of said real property, but who nevertheless are using water as of the date hereof from the system hereinafter mentioned. . . ." The provisions applicable here follow: "WHEREAS, the first party, in subdividing a portion of said real property and selling certain parcels thereof to second parties or their predecessors in interest, caused water to be conveyed thereto and to other parcels not included in the land described in said deed aforesaid, from wells located on a part of said property owned by first party, by and through the equipment and facilities hereinafter called 'Water system' which it owns and maintains on said real property, for the purpose of sprinkling and irrigating its golf course, grounds and gardens, and for the purpose of supplying water for domestic and other uses, at its club house, swimming pool, and other buildings and appurtenances; and

"WHEREAS, certain of the second parties constructed improvements on their said real property and landscaped and

beautified the same and have used water from said water system for their said gardens and grounds and for other domestic purposes at a specified monthly rate paid to the first party by second parties as their proportionate share of the cost of pumping, maintenance and repair charges; and

"Whereas, a dispute exists as to the respective rights and liabilities of the parties owning any part or parcel of said land described in the deed referred to in Paragraph 1 hereof, in and to said water and the system through which it is being conveyed to said land; and

"Whereas, it is the mutual desire of all the parties owning any part or parcel of said land that their rights and liabilities in the premises be fixed and determined by a uniform written agreement, and that all previous agreements and conditions, written or oral, express or implied, under which water has heretofore been furnished second parties or any of them, be terminated and set aside."

It is then agreed (1) that all parties have a pro rata interest in all water rights, including the wells and the waters developed thereby which are appurtenant to the property described in the deed, in the proportion that the acreage of each bears to the total acreage; (2) that the water system, including all its appurtenances, except such portion of the underground pipes as are within the lands of second parties, belongs to first party; that second parties' only interest in the system "is the continued right to be supplied with water through the present facilities for their said gardens and grounds and other domestic purposes," in proportion to acreage; (3) that during the times first party operates the system for its own needs and purposes, it shall continue to supply second parties with water at the present rates, without warranty as to quantity or quality (a provision is made for increase in rates and arbitration in case of dispute); (4) "If for any reason the first party at any time in the future shall determine to *cease operating said property as a golf club or other similar enterprise,* it shall be under no obligation whatever to continue to supply water to second parties, but in such event the second parties are hereby licensed and authorized to operate said water system, and they agree to furnish and supply first party with water for the use and protection of its said buildings, swimming pool, and other appurtenances and the grounds and gardens within an area of at least twenty acres surrounding the largest of

said buildings. Provided, however, that should first party cease to operate said system and elect to so transfer the operation thereof to second parties, it shall give to second parties at least fifteen days' written notice of such cessation and election, and the *first party agrees to place said system,* prior to the effective date of such transfer, *in a reasonable, efficient condition, order and repair,* the cost of which is to be borne between the parties, as hereinafter provided.'' (Emphasis added.) (5) A method is provided for first party to take back the water system if it desires to do so. (6) If second parties operate the system the rates to be charged first party for its requirements shall be on the same basis as is paid by each of second parties. Arbitration is provided in case of dispute. (7) Cost of operation and maintenance, repairs and replacements, except as to certain items included in the water rates, shall be paid 75 per cent by first party, 25 per cent by second parties. (10) Should any of the second parties who have not already done so, improve their property, they are entitled to connect with the water system and to receive water from it. (11) Should first party in the future sell other parcels of its real property the purchasers shall be entitled to water service on signing the agreement. (12) First party is not a public utility and ''the sole right of the second parties under this agreement is to receive their pro rata share of said water on the basis which their acreage bears to all of the real property described in said deed mentioned in Paragraph 1 hereof under the terms and conditions herein contained, so long as said system is operated by first party or upon the cessation of said operation by said first party, to operate the same under the terms and conditions herein contained, and that no further or additional rights than in this agreement described are granted to or vested in second parties.'' (14) ''This agreement and all the terms and conditions thereof *shall run with the land and be appurtenant thereto* and be binding upon and inure to the benefit of the executors, administrators, heirs, assigns and successors of the parties hereto; . . .'' (Emphasis added.) (15) The agreement shall not affect the rights of any of the parties as successors to Mrs. Hearst in her agreement with Spring Valley.

## 1. *(a) Failure of Certain Owners to Sign*

The agreement was signed by all of the purchasers of lots from the club who had improved their land and were

then using water from the system. It was not signed by about 15 persons who at that time were purchasers from the club but who had not improved their property. Defendant contends that by reason of the failure of these 15 lot owners to sign, the agreement never was executed. Although the agreement stated that the second parties were *all* of the parties or their successors in interest who purchased from first party, and that a dispute existed as to the rights and liabilities, and that it was the mutual desire of *all* the parties owning any part or parcel of the land, etc., it is obvious from a reading of the whole agreement that in order to be binding on the parties signing, it did not require the signature of all who could have signed. An open class was contemplated and the agreement became binding on such owners as signed the agreement. If there is any ambiguity in the agreement in this connection, the construction of the agreement by the parties to it resolves that ambiguity. From the very beginning all of the signers, by their acts, construed the agreement as binding upon them. This includes the club, its successors in interest, and particularly defendant. At no time prior to the trial did he ever question that the agreement was binding upon him. There was no evidence offered to the effect that the agreement was not to be binding on all parties signing unless all parties in the second parties category had signed. ". . . applicable here is the familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. (*Work* v. *Associated Almond Growers*, 102 Cal.App. 232, 235 [282 P. 965] ; 6 Cal. Jur. 304, § 184.) The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention." (*Universal Sales Corp.* v. *California Press Mfg. Co.*, 20 Cal.2d 751, 761 [128 P.2d 665].)

For over eight years defendant supplied water and made charges under the terms of the agreement, and when he felt that the operation of the system was too much of a burden for him, he turned the system over to plaintiffs, as he said in his letter, "in accordance with the water agreement."

In *Tewksbury* v. *O'Connell*, 21 Cal. 60, cited by defendant, there was an agreement for partition which was not signed by five owners or lien claimants who were named as parties. The court held that the agreement was to become effective only when executed by all the persons named as parties. However the court said (p. 69): "Without entering into a separate examination of each case, it will suffice to say that they are cases in which, from the terms of the instrument, or from the nature of the subject-matter of the contract, it appeared that it was the intention of the parties who signed to be bound, without reference to an execution by all the parties; or where, by acting under it with a knowledge that it had not been fully executed, the parties had become estopped from denying its obligation upon them." The other cases cited by defendant are, like the Tewksbury case, not in point for the reason that the agreements were such as showed clearly that they required all parties to sign in order to become effective as to any.

The agreement was primarily one to provide service of water to the club, and to each lot owner who desired water, and who signed the agreement. The club's consideration for entering into the agreement was the sharing of the cost of the water and of operation and maintenance of the system by each lot owner who signed. That consideration would not be affected by the failure of others to sign. The rule is well expressed in 6 California Jurisprudence, page 233, section 153: "Although it has been stated that the failure of one of the parties to sign an agreement containing obligations of two will be ground for an inference that the writing was not intended as a contract of the party signing, it is not the rule that a contract, which on its face purports to be inter partes, must invariably be executed by all whose names appear in the instrument before it shall be binding upon any. One reason why it is held that an agreement which is not to be operative upon one until it has been signed by another is that such signing is the consideration upon which the first signer agrees to be bound. But when a consideration for the agreement on the part of the first signer is shown to be sufficient to authorize its enforcement, he cannot be released therefrom unless he shall show clearly that there were other considerations for his signing than those named in the instrument. If by parol stipulation, or, a fortiori, if by the writing itself, the contract was not to be deemed complete until other signatures should be added, it, without such addi-

tion, will not bind those who have signed it; but if nothing of this appears, the parties signing will be held, though even on the face of it the signatures of the others were contemplated by the draftsman.''

## 1. *(b) Is Defendant Bound?*

As above shown, defendant considered himself bound by the agreement as he operated under it for over eight years, and when he attempted to unload the burden of it, did so in accordance with its terms. The court did not expressly find that the agreement ran with the land but did find that defendant recognized it and assumed its obligations. The evidence amply supports this finding. The agreement expressly provided that it was to run with the land and to be binding upon all assigns and successors of the parties. That such an agreement does run with the land and is binding, see *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716 [93 P. 858, 15 L.R.A.N.S. 359]; *Henrici* v. *South Feather Land etc. Co.,* 177 Cal. 442 [170 P. 1135]; and *Farmer* v. *Ukiah Water Co.,* 56 Cal. 11 (cited by defendants). In the latter case the contract to supply water was not of record but the court held that the purchaser of the water ditch property was required to perform the contract to supply water to plaintiff's land as it was put upon notice by the presence on the property of lateral ditches and pipes leading to plaintiff's property. Assuming, however, that the agreement here was merely a personal one, it was of the type which the courts will enforce against the successor who took with knowledge of it. It is within the rule set forth in *Hunt* v. *Jones,* 149 Cal. 297 [86 P. 686]. There the defendant's predecessor had agreed to supply plaintiff with water on land which plaintiff was buying from the predecessor. Defendant purchased the property of the predecessor knowing of the agreement. There, referring to the covenant to supply water, the court said: ''We do not discuss the point as to whether the covenant here in question was one running with the land so as to bind the assignee of the water company as grantee of plaintiff's covenanter, the Thermalito Colony Company, association, because we think that, treated simply as a personal covenant or agreement under the allegations of the complaint, a court of equity would be warranted in enforcing it against the defendant. There can be no doubt of the proposition that personal covenants or agreements bestowing benefits and imposing restrictions upon the use of land may be enforced in

equity, where a subsequent purchaser from the covenanter takes with notice of an existing equitable claim or interest in favor of another." (P. 300.) " '. . . if the owner of land enters into a covenant concerning the land, concerning its uses, subjecting it to easements or personal servitudes and the like, and the land is afterwards conveyed or sold to one who has notice of the covenants, the grantee or purchaser will take the premises bound by the covenant, and will be compelled in equity either to specifically execute it, or will be restrained from violating it; and it makes no difference whatever with respect to this liability in equity whether the covenant is or is not one which "in law runs with the land." ' " (P. 301.)

Cases cited by defendant, such as *Wolfert* v. *Guadagno*, 130 Cal.App. 661 [20 P.2d 360], holding that one purchasing real property subject to a mortgage or deed of trust does not thereby assume the obligations so secured, are not applicable here, as it is the rule set forth in the Hunt case which does apply. Nor can there be any application of the statute of frauds. Defendant was bound to comply with the agreement.

### 2. *Was Defendant Entitled to Transfer the System?*

Under the agreement, defendant was entitled to transfer the system to plaintiffs only (a) when he ceased "operating said property as a golf club or *other similar enterprise.*" (Emphasis added.) Defendant lays great stress upon the fact that he is not operating a golf club. He almost completely ignores the second phrase "other similar enterprise." The operation of a guest or dude ranch, offering the public golf course, swimming pool and the other facilities heretofore mentioned, obviously is a similar enterprise to a golf club. Especially is the use of water on such a ranch similar to the use of water by a golf club. Therefore, defendant had no right under the agreement to refuse to continue to operate the water system.

The agreement provides that if defendant is entitled to transfer the system to plaintiffs, he must, prior to the effective date of such transfer, place the system in a reasonably efficient condition, order and repair. This the evidence clearly discloses defendant did not do. For this second reason defendant was not entitled to transfer the system.

### 3. *Defendant's Liability*

The agreement provided that in the event the system is operated by second parties, the rates to be charged defendant

for his requirements shall be on the same basis as are paid by each of the other parties. Each is paying the same meter rate as was charged defendant. Of course, each plaintiff has only one connection from which to take water to his respective lot, and only one meter. The evidence shows that it was impracticable (and there is no evidence to the contrary) to place a meter on each of defendant's connections, or to obtain and place one meter for all connections. Defendant's main complaint is that he was denied a decreasing rate per 1,000 cubic feet after the first 2,000. He contends that generally, on other water systems, large consumers of water (which, of course, he is) are allowed a lower rate than is given the ordinary home consumer. Having in mind that the agreement says he shall be charged ''on the same basis'' as the rates paid by each of the others, and the testimony as to the method used in arriving at the charge to make defendant, we cannot say that the court's finding that the basis is reasonable is not well supported by the evidence. Moreover, it must be remembered that the rates charged are not similar to those charged by the ordinary water company. Here the rates paid are for the maintenance and operation of the system only. The water came to the system free, as it came from the wells on the club property as supplemented by water from San Francisco under the Spring Valley-Hearst agreement. No charge was made to the consumers for the water. The meter rate as to all parties was for the proportionate sharing of maintenance, operation and repairs, of the latter of which defendant was required under the agreement to pay 75 per cent. Again there was no evidence offered to show that the charges made by plaintiffs resulted in any greater expense to defendant than during his own operation of the system.

In view of the fact that defendant was not entitled to transfer the system to plaintiffs, it may be doubtful if the basis set forth in the agreement applies. However, defendant certainly would not be entitled, because of his wrong, to any more favorable basis.

### 4. Are Indispensable Parties Absent?

The court found that plaintiffs comprise all the parties having or claiming any interest in the agreement. It also found that there were at least 15 others who owned property in the tract but who did not sign the agreement. Of these Haas and wife were persons who came within the description of second parties (apparently they are the only persons not

agreement signers or successors of agreement signers who are receiving water). Defendant contends that these 15 or more parties are indispensable parties to the action, apparently on the theory that the court was being asked to apportion water between all lot owners. Actually, this proceeding was brought only to determine the rights under the agreement as between those signing and defendant, and not for apportionment of water. The contest is over who should operate the system, rather than any apportionment of water or water rights. This decree binds and is for the benefit of the parties to the action only. Neither Haas nor the other property owners who did not sign the agreement can claim any rights under the decree. Therefore, they are not indispensable parties. Cases cited by defendant such as *Mitau* v. *Roddan*, 149 Cal. 1 [84 P. 145, 6 L.R.A.N.S. 275], holding that an action involving a general accounting between the beneficiaries under a trust deed required the joining of all the beneficiaries; *Olson* v. *Lovell*, 91 Cal. 506 [27 P. 765], holding that a contract for exchange of land which one of the second party owners failed to sign could not be specifically performed against the co-owner signing; *Mullarky* v. *Young*, 9 Cal.App. 686 [100 P. 709], where a contract for the conveyance of real property between two named parties of the first part and two named parties of the second part, was signed by one only of each part, was held not to constitute a complete contract; as well as the other cited cases, are clearly not in point. The case of *Cavanaugh* v. *Casselman*, 88 Cal. 543 [26 P. 515], cited by defendant, actually supports the action of the trial court here. There, an agreement for sale of real property, which on its face purported to be an agreement *inter partes,* although signed by the other party, was not signed by the party seeking to enforce it. In holding that it could be enforced as there was no showing that it was not to be deemed complete unless signed by both parties, the court used this language applicable here (p. 549) : ''It is not the rule that a contract, which on its face purports to be *inter partes,* must invariably be executed by all whose names appear in the instrument before it shall be binding upon any. One reason why it is held in many of the cases that an agreement which is not to be operative upon one until it has been signed by another is, that such signing is the consideration upon which the first signer agrees to be bound; but when a sufficient consideration for the agreement on the part of the first signer is shown to authorize its enforcement, he cannot be released

therefrom unless he shall show clearly that there were other considerations for his signing the agreement than those named in the instrument.''

Defendant has not shown that there was any consideration for his signing the agreement other than its binding effect on those who did sign.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 28, 1951, and appellant's petition for a hearing by the Supreme Court was denied May 24, 1951.