[Civ. No. 26305. Second Dist., Div. Four. Apr. 18, 1962.]

PEABODY SEATING COMPANY, INC., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; AMERICAN SEATING COMPANY et al., Real Parties in Interest.

Nichols, Stead, Boileau & Lamb for Petitioner.

No appearance for Respondent.

Kirkpatrick & Kirkpatrick and MacFarlane, Schaefer & Haun for Real Parties in Interest.

THE COURT.—American Seating Company (hereinafter referred to as American) instituted a declaratory relief action naming as defendants the City of Long Beach (hereinafter referred to as City); Gust K. Newberg Construction Co. (hereinafter referred to as Newberg); Stanley Mattox, individually and doing business as Gymnastic Supply Company, and Gymnastic Supply Company, a corporation (hereinafter referred to as Gymnastic). The action involves a determination of the rights, duties and obligations of the parties in connection with the installation of stadium seats in a convention and exhibit hall being constructed for the City by Newberg.

The City submitted to various contractors for bids certain plans and specifications for the construction of the building, all bids to be submitted by August 17, 1960. Item 1 thereof, called the "Base Bid," provided for the installation of "hardwood type" stadium seating. The bidding instructions required the bidding contractors to also submit bids on Items 2, 3 and 4; Item 4, Alternate B, provided for the installation of an "upholstered type" chair. The instructions required the bidders to set forth the name and location of the place of business of each subcontractor who would perform labor or render services to the general contractor in the performance of said construction project in an amount in excess of one-half of one per cent of the general contractor's total bid.

Defendant Newberg, in its bid as submitted on August 17, 1960, designated the subcontractors who would perform labor and render services in the event the contract was awarded to it. It listed the name of Gymnastic Supply Company opposite the words "stadium seating." It did not separately name or designate a subcontractor to manufacture and install upholstered type seating.

Prior to the submission of bids to the City on August 17, 1960, American submitted to Newberg its bid of $213,000 for furnishing and installing the upholstered stadium seating under Bid Item 4, Alternate B. American alleges that this was the lowest bid; that Newberg used this bid in computing and submitting its bid to the City, but that Newberg inadvertently failed to designate American therein as such subcontractor; that prior to the letting of the general contract for said project, Newberg supplemented its bid by delivery to the City of a letter dated October 14, 1960, which states that "the upholstered seats which are to be furnished under Specification 31, Alternate #B, will be as furnished by the American Seating Company"; that the City awarded the contract to Newberg, exercised its option to have the upholstered type seat installed in lieu of the hardwood type, and incorporated a provision therefor into said contract.

Defendant Newberg has a contract with Gymnastic and intends to have Gymnastic install the upholstered type stadium seating manufactured by Peabody Seating Company, petitioner herein. Prior to the submission of Newberg's bid to the City, Gymnastic did not submit to Newberg a bid for the upholstered type seating. It is the position of Newberg that in designating Gymnastic as the subcontractor who would install the stadium chairs, it intended such subcontractor to install the stadium chairs regardless of which type would be finally installed; that the specification of the name of the manufacturer was not required under the Municipal Code or the bidding instructions; that both types of chairs are fixtures, thus it was not, in any event, required to specify in its bid the subcontractor who would furnish and install said chairs; and that under its contract with the City it is entitled to furnish any one of three seats approved by the architect[1] and may have such seats furnished by any person, firm or company that it desires. Newberg further asserts that it inadvertently advised the City in its letter of October 14, 1960, that the stadium seats would be manufactured by American; that thereafter it discovered its error and on December 31, 1960, advised the City that its subcontractor Gymnastic would furnish chairs manufactured by Peabody Seating Company (hereinafter referred to as Peabody). Newberg asserts

[1]The City alleges that it approved for installation upholstered seats as manufactured by American Seating Company, Haywood-Wakefield, model TC 700, and Peabody Seating Company.

that it at no time advised American that it intended to designate or had designated it as a subcontractor or supplier under its contract with the City; that there was no contractual obligation between itself and American.

American contends that the designation by Newberg of Gymnastic as a subcontractor to install the stadium chairs under the "Base Bid" is not a designation of the subcontractor to furnish and install the upholstered seating under Bid Item 4, Alternate B; that, based upon applicable laws and ordinances, its negotiations with Newberg resulted in a contract; that its written bid was orally accepted; that American is obligated to Newberg to furnish and install upholstered seating per said bid; that the designation of American in the October 14 letter was a correct and proper designation of a subcontractor which cannot be changed; that Newberg is under a contractual obligation to the City to provide seating manufactured by American, and that Newberg is estopped from providing the upholstered seat under Bid Item 4, Alternate B, manufactured or installed by any person or firm other than American.

The issues as framed by the above named parties in the pretrial statement of November 16, 1961, at which time trial was set for December 19, 1961, are as follows: 1. Was the naming or designation of a subcontractor to furnish and perform stadium seating required in connection with the submission of bids on the subject project? 2. Was there an effective designation or naming of the subcontractor to perform the "upholstered type" stadium seating as provided in section 31 of the specifications, Bid Item 4, Alternate B? 3. If so, can the subcontractor manufacturing, furnishing or installing the stadium seating upon the construction project be changed or substituted under the facts and circumstances herein? 4. Declaration of the contractual obligations pertaining to stadium seating between the City and Newberg. 5. Determination of the rights and obligations between American and Newberg; what contractual obligation, if any, existed between these two parties. 6. Is the doctrine of estoppel applicable? 7. Is the doctrine of laches applicable?

Due to a congested court calendar, trial date was continued from December 19 to December 20, 1961, on which date counsel for Gymnastic moved that Peabody be joined as an indispensable party under Code of Civil Procedure, section 389. The court made its order that Peabody (and General

Seating Company)[2] "be brought into this action and be deemed as parties defendant herein" and the cause was continued to January 30, 1962. On December 27, 1961, petitioner was served with summons, complaint and pretrial orders.

On January 30, American moved for separate trials, requesting that the trial involving the original parties be made separate from the one involving Peabody. The motion was denied that date. Also, on January 30, the court sustained the special demurrer of Peabody (filed the previous day), "plaintiff to amend as to defendant Peabody Seating Co. by February 6, 1962." Trial was continued to March 8, 1962. American states that it declined to amend the complaint "inasmuch as it had no knowledge or information of any facts which would in any way state a cause of action against said Peabody Seating Co., Inc."

On March 5 (three days before trial) Peabody filed an answer and cross-complaint. It also filed a motion to set aside and vacate the pretrial order and the trial date, to nullify all pretrial proceedings, and to place the matter off the civil action list. The motion was taken under submission, resulting in a further continuance of the trial date to March 28. The cross-complaint alleges the contract between Newberg, as general contractor, and Gymnastic and General Seating Company, as subcontractors to supply and install the stadium seats; that Peabody thereafter contracted with said subcontractors for the manufacture of said seats; and that, pursuant to said contract, it has expended considerable money in the manufacturing process generally and in the purchase of materials. The cross-complaint and the answer thereto present no new or additional controversy. Peabody merely disputes the contention of American that it has a contract with Newberg, and claims that the contract between Newberg and Gymnastic is valid.

On March 6, American filed a motion to strike the answer and cross-complaint, or for separate trials. On March 13, the following minute order was made: "Motion to strike answer and cross-complaint is denied. Motion for separate trials is granted so that issues framed by existing pre-trial orders shall be heard in one trial and all other issues now or hereafter arising, are [sic] particularly those in the pleadings of

---

[2]The demurrer to the complaint of General Seating Company was sustained without leave to amend on January 23, 1962.

Peabody Seating Company shall be separately tried."[3] The trial judge expressed the opinion that Peabody was but a supplier of goods and should not have been made a party to the action in the first place; that it was not an indispensable party. Peabody moved for an ex parte order revoking the order of March 13 under Code of Civil Procedure, section 1008, claiming that the same motion had earlier been denied. This motion was denied.

On March 26 (two days before trial) Peabody again moved for a continuance of the trial based upon the fact that it was going to appeal the order granting separate trials. Upon the ground that it was a nonappealable order, the motion was denied.

Thereupon, on March 27, the within petition for a writ of prohibition was filed seeking an order restraining respondent court from trying the issues separately as to petitioner and ordering the court to revoke the order for separate trials. It is petitioner's position that it is an indispensable party and that it is only as to a "conditionally necessary party" that a court has jurisdiction to order separate trials. (Code Civ. Proc., § 389.)

Code of Civil Procedure, section 389, provides: "A person is an indispensable party to an action if his absence will prevent the court from rendering any effective judgment between the parties or would seriously prejudice any party before the court or if his interest would be inequitably affected or jeopardized by a judgment rendered between the parties.

"A person who is not an indispensable party but whose joinder would enable the court to determine additional causes of action arising out of the transaction or occurrence involved in the action is a conditionally necessary party. . . .

"If, after additional conditionally necessary parties have been brought in pursuant to this section, the court finds that the trial will be unduly complicated or delayed because of the number of parties or causes of action involved, the court may order separate trials as to such parties or make such order as may be just."

It is well settled that if a court attempts to proceed in an action without the presence of indispensable parties it acts beyond its jurisdiction and may be restrained by prohibition. (*Bank of California* v. *Superior Court*, 16 Cal.2d 516, 522-523 [106 P.2d 879].) But "[w]hen he is

[3]By reason of this order, the court on March 14, denied the motion of Peabody to vacate the pretrial order and trial date.

found to be a proper or necessary party proceeding in his absence is not jurisdictional but error at the most, dependent upon the circumstances." (*Harrington* v. *Evans,* 99 Cal.App. 2d 269, 271 [221 P.2d 696].)

With reference to section 389 of the Code of Civil Procedure, it is stated in *Bowles* v. *Superior Court,* 44 Cal.2d 574, 583 [283 P.2d 704] : "As pointed out in *Bank of California* v. *Superior Court,* 16 Cal.2d 516, 521 [106 P.2d 879], in applying this section, a distinction has been drawn between necessary and indispensable parties. Where persons are so interested in the controversy that they should normally be made parties in order to enable the court to do complete justice, but their interests are separable from the rest, they are necessary but not indispensable parties. On the other hand, one may be an indispensable party if his interest in the subject matter of the controversy is of such a nature that a final decree cannot be rendered between the other parties to the suit without inevitably affecting that interest."

In the instant case the real object of American's action is to establish the existence of a contract between itself and Newberg, or a legal obligation on the part of Newberg in favor of American by reason of certain ordinances and Newberg's contract with the City. This involves a determination also of the validity of the contract between Newberg and Gymnastic. The controversy involves the legal rights and duties of the parties to such contracts only, a conclusive determination of which may be had without the presence of Peabody; nor will the absence of Peabody prejudice any of these parties. (See *Goldsworthy* v. *Dobbins,* 110 Cal.App.2d 802, 807 [243 P.2d 883] ; *John* v. *Marshall,* 103 Cal.App.2d 172, 183-184 [229 P.2d 367] ; *Caldwell* v. *Regents of University of Cal.,* 35 Cal.App. 639, 640 [170 P. 666] ; *Baines* v. *Zuieback,* 84 Cal.App.2d 483, 492-493 [191 P.2d 67] ; *First Nat. etc. Bank* v. *Superior Court,* 19 Cal.2d 409, 415 [121 P.2d 729] ; *Jollie* v. *Superior Court,* 38 Cal.2d 52, 59 [237 P.2d 641] ; *Simmons* v. *California Institute of Technology,* 34 Cal.2d 264, 276 [209 P.2d 581].)

Petitioner claims, however, that its "interest would be inequitably affected or jeopardized by a judgment rendered between the parties." (Code Civ. Proc., § 389.) Obviously Peabody has an interest in knowing whether the right and duty to furnish the stadium seats belongs to American or Gymnastic, but such "interest" is but consequential and economic; it is not a legal interest in the subject matter of

the controversy and Peabody can claim no rights under a judgment in the declaratory relief action.

As stated by Professor Edwin Borchard, Declaratory Judgments (2d ed.) page 259: ██ "Legal interest is the criterion of joinder; . . . " (Cf., *Schriber Sheet Metal & Roofers* v. *Shook,* 64 Ohio App. 276 [28 N.E.2d 699, 703]; *Miller* v. *City of Phoenix,* 51 Ariz. 254 [75 P.2d 1033]; *Ex-Cell-O Corp.* v. *City of Chicago,* 115 F.2d 627.) Peabody is not a party to any of the contracts mentioned in the declaratory relief action and claims an interest in the controversy solely by reason of its contract with Gymnastic. It has no more interest in the matter than numerous other suppliers of goods or materials to a subcontractor. A judgment in the action will not result in a termination or forfeiture of its contract with Gymnastic (Cf. *Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232, 263-265 [73 P.2d 1163]; *Thomson* v. *Talbert Drainage Dist.,* 168 Cal.App.2d 687, 690 [336 P.2d 174]), and it need not determine, nor will it directly affect, Peabody's legal rights or remedies under its contract. ██ In speaking of parties not indispensable, the court states in *Bank of California* v. *Superior Court, supra,* 16 Cal.2d 516, 523: "The other classification includes persons who are interested in the sense that they might possibly be affected by the decision, or whose interests in the subject matter or transaction are such that it cannot be finally and completely settled without them; but nevertheless their interests are so separable that a decree may be rendered between the parties before the court without affecting those others. These latter may perhaps be 'necessary' parties to a complete settlement of the entire controversy or transaction, but are not 'indispensable' to any valid judgment in the particular case. They should normally be joined, and the court, following the equity rule, will usually require them to be joined, in order to carry out the policy of complete determination and avoidance of multiplicity of suits. But, since the rule itself is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicability."

It does not appear from the record that the trial court, in ordering that petitioner be brought into the case, did so on the basis that it was an indispensable party. At the time of making that order the court stated: "I will make an order that the plaintiff include them in the action and serve them with process and a copy of pleading that involve them, and they are involved in this case, so that they may make a defense

if they care to by filing an answer or doing whatever else they, under the law, desire to do. That is all that I am saying is that they should be given the opportunity by being served, if that can be done. If they can't be served, then they can't, and then you can proceed from there. I will order that be done.''

Nor did the court, in denying the order for separate trials on January 30th necessarily do so on the ground that Peabody was an indispensable party. We do not know the basis of that ruling. But the record shows only that, at that time, Peabody had been made a party defendant. Its demurrer was filed after the filing of the motion and had not been ruled upon. Subsequent to this ruling, and prior to the order of March 13, granting separate trials, Peabody had filed its answer and cross-complaint showing that it was not a party to the contracts mentioned in American's complaint; that it was but a supplier of materials to a subcontractor (Gymnastic) involving an entirely different contract. Thus the order of March 13 was made upon a completely different showing.

It is our conclusion that the trial court found, and the record indisputably shows, that Peabody is not an indispensable party. Thus the court acted within its discretion in ordering separate trials and the question of jurisdiction is not involved.

The alternative writ is discharged and the peremptory writ is denied.

[Civ. No. 6856. Fourth Dist. Apr. 18, 1962.]

JOSEPH P. LATTANZI, a Minor, etc., Plaintiff and Appellant, v. SAN MORITZ CLUB et al., Defendants and Respondents.

Otis Babcock and Roy S. Giordano for Plaintiff and Appellant.

Chase, Rotchford, Downen & Drukker, Henry J. Bogust and William G. Tucker for Defendants and Respondents.

GRIFFIN, P. J.—This is an appeal by a minor plaintiff and appellant, Joseph P. Lattanzi, by his guardian *ad litem*, from a judgment in favor of defendants and respondents San Moritz Club, a corporation, and Blake Woodcox, entered by the trial court after a trial without a jury.

The evidence discloses that the plaintiff was injured on November 26, 1958, a week before his 18th birthday, at an ice-skating rink on the premises owned and operated by the San Moritz Club. Plaintiff's foot was cut when it came in contact with a part of an ice-shaving machine owned by the defendant Club. The part of the machine involved was a rotating scraper, variously referred to as a "rotating cylinder," "rotating drum," or "roller." Apparently, this roller was about three feet in length and four inches in diameter, located somewhat like the brush in an upright vacuum cleaner, and the roller had teeth in it about one-half inch long which came in contact with the ice when it was in operation and shaved or scraped the top of the ice over which the machine traversed. These blades served the dual function of shaving the ice and pulling the machine in a forward motion over the ice. The machine contained a device whereby the roller could be lifted approximately two to two and one-half inches off of the ice when the machine was not in operation. When the roller is in this "idling position," it continues to rotate if the machine is not turned off. When in use, the protective guard or device is about one-half inch from the ice.

Defendant Woodcox was the manager of the skating rink at the time plaintiff was injured and he operated the machine in plaintiff's view for some length of time before the accident. The evidence is in conflict as to whether the plaintiff rode on it for 20 minutes to a half hour immediately before the acci-

dent as he claimed. Woodcox testified that he did not remember his being on it but he did observe him, for the first time, coming across the ice without skates in a sliding walk, with his shoes on, and that he slid his foot under the machine. Woodcox testified that he previously had warned plaintiff not to come onto the ice with shoes and no skates, and he repeated the warning when he saw him taking off his skates just before the accident. Plaintiff testified that as he approached the machine, he was aware that it was lifted off of the ice and that he ''guessed'' that it was about two or three inches in the air; that a gasoline motor operated it and it was making quite a noise, but he said he wasn't paying any attention to the machine, and knew the ice was slippery. The evidence shows that plaintiff observed the machine cut into the ice and through ice while it was in operation and that he knew the principle of its operation; that during this period the machine had been raised into the idling position two or three times. Plaintiff testified that he was riding on the machine to weight it down and that it had been placed in idling position by Woodcox; that he went over to the bench some 15 feet away to obtain a cushion and that he came back toward the machine and started an intentional ''sliding motion'' toward Woodcox and while still in this ''sliding motion,'' his foot came in contact with the rotating cylinder while the machine was in idling position. Plaintiff was wearing street shoes at the time. Plaintiff's purpose in coming to the skating rink was to skate and later to perform certain services for which he would be given the privilege of skating. He testified that he did not know that there was no complete guard around the roller when it was in the idling position, but he admitted that he knew that the blade was raised about three inches off the ice and continued turning in this position. He admitted that when he approached the machine he knew the ice was slippery and that there were chips of ice, snow and ice residue in the area, but he said he wasn't thinking about the machine as he came back to it. He suffered considerable injury to his foot by the rotating drum. The record shows that immediately after the accident defendant placed plaintiff's name on the payroll so that he could obtain proper medical care.

After trial, the court found generally in favor of defendants and against plaintiff and found plaintiff was an invitee upon the premises and that neither defendant was negligent in any manner; that the condition of said ice machine and said premises was open and *obvious* to all persons, including

plaintiff; that no finding on the question of contributory negligence or assumption of risk was made in view of the fact that no negligence of defendants was shown. Other named defendants were dismissed from the action. Judgment was entered accordingly.

On this appeal, plaintiff claims: (1) insufficiency of the evidence to support the judgment; (2) the evidence shows conclusively that the mechanism in question was dangerous and that there was a duty to warn the plaintiff of the danger and that no warning was given; (3) the evidence also shows conclusively that there was a violation of safety orders and accordingly there was negligence on the part of defendants; and (4) the findings are fatally defective in failing to find on the question of a violation of the safety orders or regulations.

### SUFFICIENCY OF EVIDENCE AND DUTY TO WARN

The main, if not the sole, argument in this respect is that there was a dangerous condition of the machine and since plaintiff was an invitee he was entitled to a warning of such dangerous condition. It is true that a landowner owes a duty to an invitee of warning of an existing dangerous condition, but there is no such duty where the dangerous condition is so obvious that the invitee could reasonably be expected to see it. (*Mula* v. *Meyer*, 132 Cal.App.2d 279 [282 P.2d 107].) The trial court's memorandum opinion recognized this proposition and said:

''The ice shaving machine in the instant case is one whose dangerous aspects are obvious. It was operated by a gasoline motor with such power and force as to shave the ice and to throw it aside, when the machine was in operation. It appears from the photograph of it in evidence that it consists, among other things, of a chain drive, which obviously is noisy, and the plaintiff testified that he had watched it for a period of at least an hour prior to the accident. It would seem that the danger thus involved is an obvious one and one of which the defendant has no duty to warn. In fact, it is difficult to conceive of what the defendant's agents might say which would be any more impressive warning than the machine itself in operation.''

This was a factual question for the trial court. The evidence totally supports the findings and judgment. (*Philips* v. *Sun-Best Fruit Distributors,* 160 Cal.App.2d 70 [324 P.2d 948]; *Pauly* v. *King,* 44 Cal.2d 649 [284 P.2d 487].)

550

## Industrial Safety Regulations

■ At the close of plaintiff's case, he offered in evidence certain industrial safety regulations in reference to providing guard and guard rails for certain equipment, i.e. sections 3501, 3504 and 3510, safety orders of Division of Industrial Safety. Section 3501, subdivision (d) defines flywheel or balance wheel as: ". . . a heavy wheel which by its inertia assists in securing uniform motion of machinery by resisting sudden changes of speed."

Section 3501, subdivision (d) defines guarded as: ". . . shielded . . . so as to remove liability of accidental contact . . ."

Section 3501, subdivision (g) defines machine as: ". . . the driven units of the equipment as distinguished from the driving unit . . ."

Section 3501, subdivision (h) defines parts, as used in these orders, as: ". . . all moving parts of the machine except those forming part of the point of operation."

Section 3501, subdivision (j) defines point of operation as: ". . . that part of a machine which performs an operation upon the stock or material."

Under section 3510, subdivision (b), a machine flywheel is defined as: ". . . having spokes or projections . . ."

Plaintiff argues that the cylinder, three feet long and four inches in diameter, is, under the definition, a machine flywheel and should have been equipped with an additional guard so that when the machine was in a raised position the space of 2 to 2½ inches between the present guard and the ice could protect a person against just such an accident as happened here.

It is defendants' position that this was not a flywheel within the meaning of these sections and the trial court was justified in rejecting plaintiff's claim.

Plaintiff insists that these sections were applicable and accordingly defendants were in violation of law in this respect and that defendants were guilty of negligence, as a matter of law, and that the court erred in finding no negligence on the part of defendants. (Citing *Hyde* v. *Russell & Russell, Inc.*, 176 Cal.App.2d 578 [1 Cal.Rptr. 631]; *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.*, 193 Cal.App.2d 784 [14 Cal.Rptr. 551]; *Hopper* v. *Bulaich*, 27 Cal.2d 431 [164 P.2d 483]; *Armenta* v. *Churchill*, 42 Cal.2d 448 [267 P.2d 303].)

Plaintiff therefore demands that the judgment be reversed and that a new trial be ordered only on the question of damages. Of course this suggestion would be ill-timed, because

the question of proximate cause and claim of contributory negligence would still be an issue in the case.

It appears from the record that the court did take judicial notice of these regulations and did receive them in evidence, over objections, and did consider them in connection with the alleged negligence of defendants. Whether the cylinder described constituted a flywheel within the definition of that term as illustrated in a diagram explaining the meaning of that term by the Division of Industrial Safety, as indicated by an exhibit in evidence and should have been guarded, is problematical. At least, it appears to be a factual question for the trial court to determine and not one of law. The trial judge, in his memorandum opinion, stated: "But the machine in question was so designed that, when it was in operation, it had all the necessary and proper guards required by the safety orders. It was only when the machine was idling that it was raised to a point where the guard was not effective. I am of the opinion that the safety orders were not violated."

## FINDINGS

Plaintiff complains because the trial court failed to make a specific finding on the question whether or not these sections were violated. The complaint does not allege a violation of these sections as grounds for negligence. The pretrial order does not mention them. The memorandum opinion definitely shows that the court considered them and, after reviewing all the evidence, including these regulations, it found generally against the plaintiff and specifically found that neither defendant was negligent "in any manner, particularly or at all" and "operated and maintained . . . the said ice machine without negligence." Plaintiff did not object to these findings and proposed no specific express finding on that issue.

It is axiomatic that the appellate courts continually uphold judgments in spite of a failure to find specifically on a material issue where there are other more general findings from which the omitted finding follows by necessary implication. (*New* v. *New*, 148 Cal.App.2d 372, 388 [306 P.2d 987]; *County of El Dorado* v. *Al Tahoe Investment Co.*, 175 Cal. App.2d 407, 413 [346 P.2d 205]; *Pry Corp. of America* v. *Leach*, 177 Cal.App.2d 632, 636 [2 Cal.Rptr. 425]; *Elliot* v. *Jensen*, 187 Cal.App.2d 389, 393 [9 Cal.Rptr. 642].) It is also the rule that where a proper finding is made upon an issue, it is not necessary to negate issues contradictory thereto, since the finding on the first issue is an implied negation of all

552

contrary propositions. (*Kux* v. *Cal-West Lumber Corp.*, 162 Cal.App.2d 500, 505 [328 P.2d 240]; 2 Witkin, California Procedure, sec. 118, p. 1850. There was a sufficient finding on the subject.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied May 8, 1962, and appellant's petition for a hearing by the Supreme Court was denied June 13, 1962.

[Civ. No. 19864. First Dist., Div. One. Apr. 19, 1962.]

Estate of MAX FEIERMAN, Deceased. ZOLA EMANUEL et al., Claimants and Appellants, v. MARION FEIERMAN, as Executrix, etc., Petitioner and Respondent.

Francis J. McTernan, and Garry, Dreyfus & McTernan for Claimants and Appellants.

Kirkbride, Wilson, Harzfeld & Wallace and Norman Kavanaugh for Petitioner and Respondent.

TOBRINER, J.—We believe respondent's instant petition for instructions as to whether she should distribute certain bequests to Soviet claimants does not properly fall within section 588 of the Probate Code which was invoked in the instant matter. Even if the section applied, we cannot sustain the order upon either of two possible hypotheses as to the basis of the court's ruling. The first possibility is that the court rested its order upon the finding that the provisions of the will could not be executed and the bequests actually received by the claimants; yet the court failed to render any such finding. Nor do we believe the order should be sustained upon the second possible hypothesis that the probate court took judicial notice of Soviet law and found a lack of reciprocity of such law under section 259 of the Probate Code. The record does not indicate whether or not the court actually took such notice. We believe the better practice calls for the court's designation of whether or not it rested its ruling upon its judicial notice of foreign law and its recordation of the material upon which it has relied.

Max Feierman died on July 2, 1959, in Burlingame, California. The Superior Court of San Mateo County admitted his will to probate, and the wife of the decedent, Marion Feierman, qualified as executrix on August 4, 1959. Pursuant to section 588 of the Probate Code the executrix filed a petition for instructions requesting the court to inform her whether or not three legacies under paragraph seven of the will should be paid to the named persons.

Paragraph seven bequeathed $5,000 to decedent's wife "with instructions that she pay said sum to my nephew, Zola Emanuel . . . [who resides in the U.S.S.R.] *if he is then able to personally receive it and enjoy the benefit thereof.*" (Emphasis added.) The will provided for a second gift of $100 to decedent's wife to be given upon the same condition to another nephew, Feuerman Samuel, also a resident of the U.S.S.R. On the identical condition the will granted a third gift of $100 to another nephew, whose name was unknown by the testator. The final provision of this paragraph of the will stipulated that upon the death or "inability" of the nephews "to receive their bequests" within five years of the death of the testator, the money remained the separate property of the testator's wife.

The above-mentioned petition for instructions alleged that the attorney for the decedent advised him that the attorney "had been informed that there was no reciprocal treaty which would permit persons behind the iron curtain to receive bequests from estates in the United States, and said Max Feierman believed that his nephews . . . would be able to receive legacies only if they escaped from behind the iron curtain. . . ." The petition also set out that respondent's attorneys wrote to the Secretary of State of the United States requesting information as to the situation in the Soviet Union, and on November 4, 1959, received a reply from the Chief, Division of Property Claims, Estates and Legal Documents, Department of State, stating that "The Department is informed that under foreign exchange control regulations of the Union of Soviet Socialist Republics dollar funds remitted through banking channels are retained by the Soviet Government and the person to whom the remittance is directed receives Soviet currency at a fixed rate of exchange." The communication also stated: "The Secretary of the Treasury is authorized by law (31 U.S.C. 123) to determine the countries to which United States Treasury checks may not be sent because local conditions preclude assurance that the payee will receive the check and if he receives it will be able to negotiate it for its

full value. The list of countries to which checks are not sent (31 C.F.R. 221.3) includes the Union of Soviet Socialist Republics.''

Finally, the petition for instructions included as exhibits letters from appellants' attorneys stating their representation and asserting that they would ''exhibit . . . various documents and data which will convince you and reassure . . . [you] that the heirs in the Soviet Union will actually receive and have the beneficial use of the money.'' The petition annexed as an exhibit a letter dated December 1, 1959, from the American Embassy at Moscow asserting that it was ''the Embassy's understanding, based in part on statements from several Soviet heirs to estates in the U.S., that in law and in practice Soviet heirs may receive inheritances from the United States at the established exchange rates for currency and dispose of the proceeds for their own benefit as they see fit.''

The court held a hearing on the petition for instructions, entering into evidence two exhibits, marked, respectively, exhibits A and B, which were submitted by the legatees. Exhibit B consisted of the report of the referee in another case (*Estate of Anna Smith* (1960) Superior Court No. 124249), which also involved inheritance by Soviet citizens from the estate of a decedent domiciled in California. In that case the referee found that reciprocity existed between the two countries. Exhibit A consisted of the reporter's transcript from the above-mentioned case of *Estate of Smith*; it contained the documents set forth in the footnote.[1]

---

[1]Exhibit A contained, among others, the following documents:

(1) The transcript from another case, the *Estate of Singer* (Superior Court, No. 126663).

(2) The findings of fact and conclusions of law in another case (*In re Salman-Gorina*, Superior Court No. 650174). One of the conclusions of law reached in that case was that a reciprocal right did exist between citizens of the United States and the U.S.S.R. in 1952.

(3) A letter from Manufacturer's Trust Company setting out the method of sending funds from the United States to the U.S.S.R.

(4) A report of Professor Harold J. Berman of Harvard Law School to the Probate Court, Suffolk County, Mass., dated October 15, 1958, regarding a delivery of funds that Prof. Berman made to a legatee in the Soviet Union at the direction of the court. The report sets forth Prof. Berman's belief that the recipient would be able to use the funds personally.

(5) Deposition of Dora Einhorn, a resident of the Soviet Union regarding the inheritance by the witness from the estate of a relative in the United States and the personal receipt and enjoyment of such funds.

(6) A deposition of Abram Salman, also a Soviet resident, to the same effect as the prior deposition.

(7) A certificate from the Soviet Embassy in Washington, D. C.

The court held in a memorandum decision, and set out in its probate minutes, that both counsel conceded that no reciprocal treaty between the U.S.S.R. and the United States covered the subject matter. The court further stated that section 259 of the Probate Code required reciprocal rights of the citizens of the respective countries as a prerequisite to inheritance and that section 259.1 of the Probate Code "places the burden upon such nonresident aliens to establish the fact of existence of such reciprocal rights." The court concluded that " [t]he nephews have not alleged or proved such reciprocity"; it held: "The Executrix, Marion Feierman, is therefore instructed to pay the sum of $5,200.00 referred to in paragraph Seventh of the will, to testator's wife, Marion Feierman, upon final distribution of the estate."

We shall point out that a petition for instructions under section 588 of the Probate Code does not afford a procedure for determination of those who are to take under the will in the manner that the court determined in the instant case. We shall explain, further, that even assuming the petition for instructions were proper, and even assuming that the court's ruling could be sustained upon the ground that the provisions

---

stating that "the proceeds of decedents' estate in the United States to which legatees, distributees and beneficiaries who are nationals of 'or residents of the Soviet Union are entitled, are paid to them in full without limitations and without the retention of any sums for the benefit of the State." The certificate states that sums received by Soviet citizens or residents by inheritance from estates in the United States are not taxable in the Soviet Union, and that such sums are exchanged for rubles at the rate of 10 rubles to the dollar, rather than the official rate of 4 rubles to the dollar.